UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACQUELINE CHEESE,

                Plaintiff,                No. 00-CV-71792-DT

vs.                                      Hon. Gerald E. Rosen

UNITED STATES OF AMERICA,

                Defendant.

_____/

OPINION AND ORDER SETTING FORTH THE COURT'S
<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on September 27, 2006

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

## I. <u>INTRODUCTION</u>

This medical malpractice action, brought by Plaintiff Jacqueline Cheese pursuant

to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*., was tried by the Court without a

jury September 13-14 and November 15, 2004.  In her Amended Complaint, Plaintiff

alleges that physicians who treated her at the United States Department of Veteran Affairs

Medical Center in Ann Arbor, Michigan (the "VAMC") in April 1998 were negligent and

violated the applicable standard of care with regard to her medical treatment, causing

permanent damage to, and the ultimate removal of,  her right kidney.

1

During the course of the three-day bench trial, the Court heard the testimony of Plaintiff Jacqueline Cheese; Plaintiff's sisters, Beverly Mosly and Caroline Underwood; Plaintiff's daughter, Jazmyn Cheese; Plaintiff's friend, Paul Faux; Dr. Stuart Wolf, Jr., M.D.; Dr. Jay Copeland, M.D.; and Dr. David Wood, M.D. Plaintiff also presented for the Court's post-trial consideration the deposition testimony of Dr. Marlis Pacifico, M.D., Dr. Eduardo Kleer, M.D., Dr. James Murphy, M.D., and economist John Hanieski.  The Court also reviewed the deposition testimony of court-appointed expert Dr. Jay B. Hollander, M.D.[1]  The Court also received into evidence numerous medical records, photographs and diagrams.

Having heard and considered the testimony of the witnesses and the oral arguments of counsel, and having reviewed and considered the exhibits submitted at trial, the Court makes the following findings of fact and conclusions of law.[2]  To the extent that any findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II.  FINDINGS OF FACT

1.     Plaintiff Jacqueline Cheese is a divorced mother who lives in Ypsilanti,

---

[1]  Dr. Hollander did not testify at trial but he reviewed the records pertaining to this case and, after he provided the Court with a report, he was deposed by counsel for the parties concerning that report.

[2]  Following trial, the Court met in chambers with counsel for the parties who indicated that they were going to attempt to resolve this matter extrajudicially.  The Court has since been advised that the parties were unable to reach a settlement.  Therefore, the Court is issuing this Opinion and Order.

Michigan with her two children.  After graduating from high school in 1982, she attended college for approximately a year and a half and then enlisted in the U.S. Navy.  Ms. Cheese served in the Navy from 1984 until 1988 when she received an honorable discharge.  While in the Navy, Ms. Cheese received training as a Pharmacy Technician and after her discharge she worked as a pharmacy technician for several employers, including the University of Michigan Hospital and the VAMC in Ann Arbor.  Ms. Cheese was working at the VAMC at the time of the events giving rise to this action.

2.     On April 6, 1998, Ms. Cheese went to the Urgent Care Department at the VAMC complaining of left flank pain (i.e., pain on the left side of her lower back) and blood in her urine.  She was first seen in the emergency room by Dr. Whelan who told Ms. Cheese that she might have kidney stones and that it might take some time for them to pass.  Dr. Whelan, therefore, put her on three days of medical leave.

3.     The pain, however, did not subside.  Therefore, three days later, on April 9, 1998, Ms. Cheese returned to the VAMC Urgent Care to see Dr. Whelan again.  When Dr. Whelan saw that Plaintiff's symptoms had not improved, he referred her to Dr. Apoorva Vashi, the Chief Resident in Urology.  Ms. Cheese saw Dr. Vashi that same day.

4.     According to Plaintiff, Dr. Vashi was unable to determine what was causing her problem but explained that there was an outpatient procedure that he could do -- a cystoscopy retrograde pyelogram -- which would entail inserting a tube through her bladder and shooting dye into the ureter to allow the doctor to see if it was kidney stones or something else that was causing her pain.  Dr. Vashi explained that if it turned out to

3

be kidney stones, the doctor would be able to loosen them up in the same procedure. Plaintiff agreed to the procedure.

5.      Plaintiff underwent the procedure on April 15, 1998.  Prior to the procedure, Plaintiff signed a consent form which identified the procedure as "cystoscopy, retrograde pyelogram, possible ureteroscopy (L)."  The form also described the possible risks of the procedure as "bleeding, infection, [and] injury to ureter."  Plaintiff testified that the procedure and these risks were explained to her by Dr. Vashi on April 15. According to Plaintiff, all of her discussions prior to the procedure with Dr. Vashi concerned her left side pain; her right side and right kidney were never mentioned.  At the same time, however, no testimony presented at trial concerning Dr. Vashi's pre-operative discussion with Plaintiff indicates that Dr. Vashi ever told Plaintiff that the procedure was to be done only on her left kidney.[3]

6.      After signing the consent form and discussing the procedure with Dr. Vashi, Plaintiff was given an anesthetic and put to sleep for the procedure.  The procedure was performed by Dr. Robert Marcovich, a senior resident, under the direction of the "attending surgeon," Dr. Stuart Wolf, M.D.  Dr. Wolf is a board certified urologist and he

_____

[3]  It appears that Plaintiff's belief that the April 15, 1998 procedure she underwent would only involve her left side kidney stems from what was indicated on the consent form she signed -- "cystoscopy retrograde pyelogram, possible ureteroscopy (L)." [Emphasis added.] However, as discussed *infra*, the undisputed testimony of all of the doctors involved was that the "L" or "left side" limitation pertained only to the "possible ureteroscopy" -- a procedure which the doctors decided not to perform on Plaintiff.  What was performed was a cystoscopy and retrograde pyelogram for which no left-side limitation was indicated.

4

is also a member of the University of Michigan Medical School faculty.  Dr. Vashi, the

Chief Resident, assisted Dr. Marcovich.

       7.     Dr. Wolf testified that any surgical procedure done at the VAMC has to be

staffed by a faculty member from the University of Michigan who also has an

appointment at the VA.[4]  Because the VAMC is a medical training facility, the attending

surgeon's role is to train residents, while at the same time, insure that good clinical care is

provided.  As such, during surgical procedures such as Ms. Cheese's procedure, Dr. Wolf

is in the operating room directing the procedure but he does not himself physically

perform the procedure.  The actual surgery is performed by the residents.  In Ms.

Cheese's case, the surgery was performed by a senior resident, i.e., a resident in urology

who was half-way through his six year residency, and he was assisted by the chief

urology resident who was in the sixth (i.e., final) year of his residency.

       8.     Dr. Wolf never met Ms. Cheese other than in the operating room.  Dr. Wolf

testified that this was standard practice in what would be considered a straightforward

case.[5]  Dr. Wolf explained that the day before or the morning of a scheduled surgical

---

    [4] Dr. Wolf explained that almost all of the faculty at the Ann Arbor VA, as with
any Veterans' Administration Medical Center, have a primary appointment at a nearby
medical school, and then practice at the VA part-time as a shared faculty member.  He
testified that at the time in question, he was a three-eighths time VA doctor, i.e., he
worked at the VAMC 15 hours per week divided over the course of two or three days,
depending on the schedule for the week.

    [5] Both Plaintiff's expert, Dr. Jay Copeland, and Defendant's expert, Dr. David
Wood, agreed that this is what transpires at any teaching hospital -- the attending
physician does not normally see the patient.

procedure, the resident, usually the chief resident, would present each case to the

attending surgeon.  This would include the resident's description of the patient's problem,

his assessment of the risk and benefits of the procedure, and his assessment of the surgical

plan.  Dr. Wolf then would either approve it carte blanche, or he might question the

resident further to learn more before giving his approval.

9.     With respect to Plaintiff's surgical procedure, Dr. Wolf explained that Ms.

Cheese had two problems:  one was left flank pain, and the other was gross hematuria,

meaning blood in her urine that could be seen with the naked eye.  Dr. Wolf explained

that Plaintiff had already had a CT scan, which is the most sensitive way to detect the

most common problem that would cause both of those two problems together, which

would be a kidney stone, and the CT scan did not reveal that.  Therefore, the doctors

determined that they had to put her through some additional diagnostic procedures to find

out why she had pain and blood in the urine.

10.     Dr. Wolf explained that the procedure Ms. Cheese underwent -- the

cystoscopy retrograde pyelogram -- was actually two-part procedure.  First, the doctors

performed a cystoscopy, which involved inserting a small scope with a light source into

the bladder and looking all around the bladder to see if there are stones or tumors or some

other obstruction.  Because, no obstruction was observed, the doctors continued with the

second part of the procedure, the retrograde pyelogram, to evaluate problems originating

the upper urinary tract, i.e., in the ureters, the renal pelvis or the kidneys.[6]  Dr. Wolf

explained that this entailed passing a catheter up the ureter into the renal pelvis and

injecting a contrast material, and then, using x-ray equipment, the doctors could examine

the upper urinary tract.[7]

11.     Dr. Wolf testified that it was always intended before the entire procedure

was started that it would be a bilateral procedure, not just on the left side of the urinary

tract.  He explained that because the blood in Ms. Cheese's urine could have been coming

from anywhere in the urinary tract, it was important to examine both the left and the right

sides.  Even if the doctors observed blood coming out of the left side, the standard of care

requires investigating both sides.  "It would be gross substandard care to only assess one

side." [9/13/04 p.m. Tr., pp. 21-22.]

12.     After doing the retrograde pyelogram on Ms. Cheese on both sides, the

───────────────

[6]  Dr. Wolf explained that another way to examine the upper urinary tract is by
performing a ureteroscopy, which is one of the things Ms. Cheese consented to in the
consent form, but the doctors elected not to do this procedure.  Dr. Wolf explained that
this procedure is rarely performed because its harder on the patient.  Therefore, it is only
done it if an abnormality is detected in the retrograde pyelogram.  As discussed *infra*, no
abnormality was detected in Ms. Cheese's retrograde pyelogram.  Furthermore, Dr. Wolf
explained that in Ms. Cheese's case, she only consented to a ureteroscopy on her left side
so they did not view it as an option.

[7]  Dr. Wood explained that normally contrast dye would be injected into the patient
by vein and then the urinary tract would be x-rayed.  But, because Ms. Cheese had an
allergy to the contrast material, the doctors could not inject the dye by vein.  So, instead,
they had to inject the contrast dye through the urinary tract so it would not react with the
blood stream, and get an assessment that way.

doctors still could find nothing wrong -- no obstruction, no stones, no cavities, no diverticula, or blockages.  Dr. Wolf testified that at this point, the doctors felt that there were two general categories of problems that could have been causing Ms. Cheese's pain and hematuria: (1) a cancer lining the urinary tract that does not bulge out; or (2) a disease of the kidney, which to detect, would require a kidney biopsy.

13.     Dr. Wolf testified that in such situations, the general rule is to assess the lining of the urinary tract first, and then assess the kidney, and the decision was made to proceed according to this general rule with respect to Jacqueline Cheese.

14.     To assess the urinary tract lining, while they had a catheter already inserted, the doctors did a washing of the renal pelvis.  Dr. Wolf testified that a washing is part and parcel of the retrograde pyelogram.  A washing, Dr. Wolf explained, is done to knock some cells off of the urinary tract walls. To do the washing, the same catheter that was used for Ms. Cheese's retrograde pyelogram was advanced further up the ureter.  A small amount of saline was then injected through the catheter and after a few seconds it was pulled out.  The cells were then collected and sent to a cytopathologist for analysis as to the presence of carcinoma.[8]

15.  Dr. Wolf testified that there were no noted complications with the renal pelvic washing procedure performed on Ms. Cheese.  He testified that the typical sign of a perforation or puncture having occurred would be not getting back the saline fluid

---

[8]  The cells collected from Ms. Cheese were negative for cancer.

8

instilled in the patient or if the fluid came out very, very bloody, neither of which occurred in Ms. Cheese's case. The doctors, therefore, left the operating room believing that the procedure had gone well.

16.     Plaintiff testified, however, that when she woke up in the recovery area after the procedure, she had "excruciating pain" on her right side. She said that her left side still hurt, but the pain on the right side of her body was "horrible." Plaintiff testified that when she told this to the anesthesiologist, Dr. Nair, in the recovery area, he told her that she had mentioned being in a lot of pain when she first came out of the operating room. She said that Dr. Nair told her that they had immediately given her 700 micrograms of Fentanyl and that that was an unusually high dosage.

17.     Plaintiff then saw Dr. Marcovich who conducted the post-operative interview with her. (Plaintiff testified that she did not see Dr. Vashi after the procedure.) Plaintiff testified that Dr. Marcovich told her that during the procedure he had looked at her left kidney through the scope and did not see any kind of obstruction. She said that the cystoscopy was all that was discussed with her about the procedure at that post-op interview.

18.     Plaintiff testified that she also told Dr. Marcovich about this new pain on her right side. Although Plaintiff's procedure is normally an outpatient procedure, Dr. Marcovich decided that, in light of Plaintiff's continued complaints of pain, she should be admitted to the hospital and kept overnight for observation. Dr. Marcovich told her if everything they saw overnight was fine, they would send her home the next day. Plaintiff

9

was given Percocet at this time and then, once admitted, she started receiving morphine every two to three hours until she left the hospital.  She was last given morphine a half an hour before being discharged.

19.    Plaintiff testified that she was in considerable pain the entire night she spent in the hospital and was still in pain at the time of her discharge.[9]  No diagnostic study, however, was performed during her overnight stay to try to ascertain why Plaintiff was having such severe pain on her right side, nor was Dr. Wolf, the attending urologist, ever notified that Plaintiff was in such severe pain and was requiring high doses of narcotics.[10]  Plaintiff further testified that the urine she was discharging during the night was of a brownish color and as time went one, she became nauseated and began running a fever.  The doctors gave her Maalox for the nausea.  Plaintiff then began itching as a result of the morphine, and was given Benadryl to relieve the itching.  Plaintiff testified that when she

----

[9]  The hospital records confirm this.  According to the records pertaining to Plaintiff's overnight stay in the hospital, Plaintiff repeatedly complained of "severe abdominal pain" and "severe pain" throughout the night and early morning, as late as 9:25 a.m. on April 16, 1998, i.e., less than 20 minutes before Plaintiff was discharged. [*See* Plaintiff's Ex. D6; *see also*, 9/13/04 p.m. Tr. p. 94.]

[10]  The hospital records indicate that on April 15, 1998 Plaintiff was given Percocet at 3:45 p.m.; at 5:30 p.m. she was given four milligrams of morphine; at 8:00 p.m. she was given another four milligrams of morphine; at 11:15 p.m. she was given an increased dosage -- six milligrams -- of morphine; at 12:35 p.m. she was given two more tablets of Percocet then 40 minutes later -- at 1:15 a.m. on April 16 -- she was given another six milligrams of morphine; at 3:25 a.m. she was given another six milligrams of morphine; at 5:45 a.m. she was given another 6 milligrams of morphine; and at 9:25 a.m. she was given another four milligrams of morphine. [*See* Plaintiff's Ex. D4; *see also* 9/13/04 p.m. Tr. pp. 90-92, 94.]

got the Benadryl, coupled with the morphine doses, she was finally able to get a couple

hours of sleep.  The pain, however, did not go away.

20.    The next morning, April 16, Plaintiff was seen by Dr. Brian Seifman, a

junior resident.  Plaintiff testified that she told Dr. Seifman about the new pain she had on

her right side and that she did not understand why.  According to Plaintiff, Dr. Seifman

told her only that sometimes after these procedures, people are a little sore and that every

patient is different.  Dr. Seifman gave her some pain medication to take at home and an

off-work note from Dr. Vashi which indicated that she had had surgery and placed her on

medical leave until April 21, 1998.  Then, as authorized by Dr. Marcovich, Dr. Seifman

discharged her.[11]

21.    Plaintiff was driven home from the hospital by a friend.  Plaintiff testified

that she was still in pain when she got home and went immediately to bed.  At

approximately 3:00 a.m. the next day, April 17, Plaintiff testified that the pain became so

severe that it woke her up.  She tried to take more pain medication but threw up.  She

tried to eat a cracker to ease the nausea, to no avail.  Finally, she had her neighbor call the

hospital.  The hospital directed the neighbor to bring Plaintiff back in.

22.    Plaintiff testified that it was mid-morning on April 17 when she arrived

back in the emergency room of the VAMC and was seen by Dr. Marcovich.  According to

---

[11]  Dr. Marcovich testified in his deposition that it was probably his assessment
that Plaintiff was ready to go home based on "improved pain."  He did not recall,
however, if he discussed the discharge with Dr. Vashi. [Marcovich Dep., p. 34.]

Plaintiff, Dr. Marcovich's reaction when he first saw her was, "I thought I might see you back here." [9/13/04 Tr. p. 63.]  Plaintiff testified that she related to Dr. Marcovich that she was having severe pain in her right side and could not understand why since she had previously come in for treatment for pain on her left side.  Dr. Marcovich then ordered some tests.

23.     Plaintiff was first sent to radiology where x-rays were taken.  Then, a CT scan was performed on her.  According to Plaintiff, the radiologist who performed the CT scan informed her that he could see on the screen that she had some liquid leaking from her kidney.  She then was seen again by Dr. Marcovich who told her that they were going to have to insert a stent to keep urine from leaking from her right kidney.  According to Plaintiff, when she asked Dr. Marcovich why urine would be leaking from her right kidney, he told her it must have been something that was done while the doctors were performing the procedure on April 15.[12]

24.     Plaintiff then saw Dr. Vashi.  According to Plaintiff, Dr. Vashi told her that it was a very rare thing to happen and that he had never seen anything like this happen before, but that during the April 15 procedure, her right kidney had been punctured.

25.     Plaintiff signed another consent form for the stent procedure.  She testified that Dr. Marcovich went over this form with her very carefully and that she fully

---

[12]  Dr. Marcovich presumes that the perforation occurred during the portion of the procedure on April 15 when they obtained the renal washings from the right side.  He does not know exactly what happened or who injured the kidney. [Marcovich Dep., p. 40.]

12

understood everything on the form, including that the indicated risks were bleeding, infection and injury to the urinary tract, including her bladder and kidneys. The procedure was then performed, and Plaintiff testified that after the stent was inserted she was a lot more comfortable; that the pressure and throbbing that she had felt in her right kidney had been somewhat alleviated. She was, however, kept in the hospital for a week, until April 23, 1998. During her hospital stay, Plaintiff testified that she regularly saw Dr. Vashi and Dr. Marcovich.

26.    Plaintiff was discharged from the hospital on April 23rd. Upon her discharge, Ms. Cheese was placed on restricted activity and directed to stay off-work until mid-May. She was given a return appointment to return on May 13, 1998 for surgery to remove the stent. Following her discharge, Plaintiff testified that she continued to experience blood in her urine and continued to have some pain, but not as acute as it had been on April 15th and 16th.

27.    Plaintiff, however, never returned the VAMC for the removal of the stent or any other follow up. She testified that she had lost faith in the VA and decided to pursue treatment elsewhere. After talking to friends, she called the Huron Valley Urology Clinic in Ypsilanti and scheduled an appointment with Dr. Eduardo Kleer on May 8, 1998.

28.    Plaintiff testified that before her first appointment with Dr. Kleer, she obtained her medical records from the VA, and gave them to Dr. Kleer on May 8. According to Plaintiff, it was Dr. Kleer who, after reading the VA records, told her that the VA doctors had performed a right renal pelvic washing on her on April 15, 1998.

13

Plaintiff testified that this was the first time she had been informed of the right renal pelvic washing. (This information was contained in the medical records that Plaintiff had obtained from the VA, but she admits she never read them.)

29.     According to Plaintiff, at the May 8 appointment with Dr. Kleer, after Plaintiff presented her medical history and the doctor examined her, the doctor told her that he would have her come back in a couple of weeks, at which time he would remove the stent "and everything should be fine." [9/13/04 Tr., p. 81.]

30.     Plaintiff testified that she returned as directed by Dr. Kleer for the removal of the stent two weeks later, but that within 24 hours after the stent was removed, she ended up at St. Joseph Mercy Hospital's emergency room with renewed pain. A CT scan was performed on Plaintiff and she was told that her right kidney was not functioning. So, Dr. Kleer put another stent in, which Plaintiff testified was kept in for about a month. Thereafter, Plaintiff treated with Dr. Kleer on a regular basis. She testified that she saw him at least twice a month. Meanwhile, Dr. Kleer kept her off work on medical leave.

31.     When Plaintiff's condition failed to improve, Dr. Kleer informed Ms. Cheese that the only way he would be able to get a clear look at what was happening was to perform exploratory surgery.

32.     On July 15, 1998, Dr. Kleer performed surgery on Plaintiff. Plaintiff testified that originally, Dr. Kleer had told her he was going to try to scrape off some of the scar tissue from her kidney that had developed after her kidney had been punctured. However, once the doctors began the operation, what started as minor surgery turned into

14

something totally different:  Dr. Kleer discovered that Plaintiff's right kidney had calcified; it was "as hard as cement" and was not functional. [9/13/04 Tr. p. 86.]  After obtaining permission from Ms. Cheese's family, Dr. Kleer removed Plaintiff's right kidney.

33.     All of the doctors who testified at trial, including both Plaintiff's and Defendants' experts, admitted that, in most cases, a ureteral or renal pelvic puncture will heal uneventfully.  They all also agreed that they had never before seen a case like Plaintiff's where a puncture and leakage of urine caused such severe scarring that the kidney calcified and had to be removed.

34.     Following the removal of her right kidney, Plaintiff remained off work and on medical leave until her employment as a pharmacy technician at the VAMC was terminated on December 18, 1998.  Meanwhile, Plaintiff continued to treat with Dr. Kleer and her primary care physician, Dr. Marlis Pacifico.  Although the loss of her right kidney causes Plaintiff no pain or disability, she continues to suffer from "loin pain hematuria syndrome" or "LPHS" with respect to her left kidney, which was the source of the original pain when she presented to the VAMC Urgent Care in April 1998.

35.     Plaintiff testified that in February 1999, Dr. Pacifico referred her to Dr. James Murphy, a nephrologist.  According to Plaintiff, Dr. Murphy told her that because she had only one kidney, there were no treatment options available for her left kidney

problem.[13]  She continues to have constant loin pain and testified that urinating is difficult and very painful.  She said that her urine now is thick and bloody.

36.     In April 1999, Plaintiff applied for, and subsequently was placed on Social Security Disability due to her LPHS.  She remains on Social Security Disability to this date.  She testified that she is still unable to work or go to school and takes 11 or 12 different medications every day.  She testified that her only current medical treatment is "pain management."

37.     Plaintiff's expert, Dr. Jay Copeland, a board certified urologist, agreed with Dr. Wolf, that doing a bilateral retrograde pyelogram (i.e., retrograde pyelogram on both her left and right sides) was appropriate and allowable.  But, Dr. Copeland opined that it was inappropriate for the VAMC doctors to do a renal pelvic washing on either side.  In his opinion, the consent form that Plaintiff signed did not cover renal pelvic washings. He further opined that the pyelogram would have given a sufficient diagnostic scope to determine if cancer was present, and, therefore, the washings were not necessary.

38.     In Dr. Copeland's view, washings should only be used where there is a high index of cancer that is not voidable.  In other words, washings are done only if nothing is detected on a pyelogram and nothing is shown on a CT scan, but voided urine tests show

---

[13]  Although Defendants' expert, Dr. David Wood, testified that there are treatment options available for Plaintiff's LPHS, including auto-transplantation and renal innervations, that are not precluded even though Plaintiff has only one kidney, Dr. Wood testified that undergoing such procedures does not completely eliminate the patient's pain and it can, and in a large percentage of cases does, recur.

the presence of cancer cells.  Plaintiff's voided urine tests did not show the presence of
cancer cells.  Therefore, it is Dr. Copeland's opinion that the standard of care was
violated both when the VAMC doctors failed to obtain Plaintiff's separate consent for the
renal pelvic washings and, again when they decided to do washings.[14]

39.     Defendant's expert, Dr. David Wood, also a board certified urologist,
disagreed with Dr. Copeland.  In Dr. Wood's view, part and parcel to the evaluation of
hematuria is a retrograde pyelogram with renal pelvic washings.  Accordingly, he testified
that he does not believe that a separate consent was needed for the renal pelvic washings
because, "I believe it's part and parcel to the entire procedure."   [11/15/04 Tr. p. 80.]

40.     Dr. Wood explained that the main reason any of the procedures were done
on Ms. Cheese was to rule out cancer.  He noted that Ms. Cheese is a smoker and had
gross hematuria.  As both Plaintiff's and Defendant's experts acknowledged, it is an
axiom in urology that gross hematuria is cancer until proven otherwise.

41.     Dr. Wood testified that, while you could do a voided urine cytology, you
would still need to do washings to rule out cancer.  He explained that voided urine
cytologies only provide a 40-60% accurate diagnosis; washings, on the other hand, are
100% accurate -- even better than imagings -- and the additional risk of washings being

---

[14] Dr. Copeland also opined that the washings were not competently done, that
they should have been done on the bladder first, then on the left side, and then on the
right.  Here, they were done in reverse of that order.  He also said that they should have
changed catheters on each side which was not done here.  Nevertheless, Dr. Copeland
admitted that if they had done the washings his way it would not have avoided injury.

so small, it is hardly worth the risk of missing the cancer to not do them.  He agrees that it is not malpractice to only do a voided urine cytology but said that washings are preferable, adding, "it's a judgment call," left to the discretion of the surgeon.[15]

42.     Plaintiff's expert, Dr. Copeland, also testified that, in his opinion, the standard of care was also violated by the VAMC doctors when they discharged Ms. Cheese prematurely on April 16, 1998, the morning after her procedure, when she was still in a great deal of pain and required heavy doses of narcotics, without having done any diagnostic tests to determine the cause of the pain.

43.     Neither Dr. Wolf nor Dr. Wood refuted Dr. Copeland's opinion.  Dr. Wolf, in fact, testified "I very much wish we had not discharged Miss Cheese home because she went through suffering that she didn't need to." [0/13/04 p.m. Tr., pp. 37-38.] Dr. Wood also admitted that, in retrospect, given the level of pain Ms. Cheese was experiencing as evidenced by the quantity and dosages of narcotics she was given, somebody more senior should have been called in before she was discharged.  He nonetheless tried to explain away the decision to discharge Ms. Cheese stating that in the V.A. system, "the nurses and the ancillary [discharge planning] people are very much empowered to do what's best for the patient," and that "you have to trust the people that are there."  [*See* 11/15/04 Tr. pp. 95-96.] Dr. Wood reasoned that because the decision was made to discharge Ms.

---

[15]  Dr. Wood's opinion as to the propriety of doing renal pelvic washings in conjunction with a retrograde pyelogram is consistent with that espoused in the Campbell's Urology (Sixth ed.).  *See* testimony of Dr. James Wolf, reading from Campbell's Urology (Sixth ed.), p. 1141.  [9/13/04 p.m. Tr. pp. 43-44.]

Cheese, more than one of the health care workers "obviously felt her pain was getting better and wasn't bad enough to require investigation." *Id.* at 97.  In his view, if Plaintiff was in so much pain, someone in the health care system would have refused to release her. *Id.* at 96-97.

44.    Plaintiff's expert, Dr. Copeland, also opined that the standard of care was again violated by the VAMC doctors when they did not stent Ms. Cheese to stop the leakage of urine from her right kidney until late in the afternoon of April 17, 1998, 58 hours after the retrograde pyelogram procedure.[16]  In Dr. Copeland's opinion, had the stent been inserted sooner, it would not only have alleviated Ms. Cheese's pain, but also it would have greatly reduced, although would not have entirely eliminated, the danger of scarring which was what led to the calcification, and ultimately the removal, of Ms. Cheese's kidney.  Dr. Copeland admitted, however, that while there would have been less scarring had the stent been inserted earlier, he could not be certain that enough scarring would have been avoided such that the ultimate nephrectomy would not have been needed.

45.    Dr. Wood, on the other hand, testified that in the ordinary course with a perforation, he would not necessarily stent the patient but would keep her under

---

[16]  The hospital records show that Plaintiff returned to the hospital at 11:17 a.m. on April 17, 1998 and a renal ultrasound done less than 3 hours later, at 1:16 p.m. gave the first indication that fluid was leaking from her kidney.  This was confirmed by a CT scan done at 4:06 p.m., and by 4:30 p.m., Ms. Cheese was being prepped for the stent placement surgery.  She was taken into the operating room by 5:15 p.m.

observation.  He opined that given the sequence of events in Ms. Cheese's case, 58 hours

after the procedure -- which was a little over 24 hours after her discharge -- was not an

unusually long time to wait to do a stent.

### III.  CONCLUSIONS OF LAW

1.      Plaintiff has brought this action against the United States of America

pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, *et seq*., claiming that the

doctors at the Veterans' Administration Medical Center in Ann Arbor violated the

standard of care with respect to her treatment by (1) failing to obtain her permission to

perform renal pelvic washings on her on April 15, 1998; (2) performing renal pelvic

washings which Plaintiff claims were unnecessary under the circumstances; (3)

prematurely discharging Plaintiff from the hospital on April 16, 1998 when she was still

under considerable pain and without determining the cause of the pain; and (4) failing to

stent Plaintiff sooner than 4:30-5:00 p.m. on April 17, 1998 to stop the leaking of the

urine.

2.      The liability of the United States of America under the Federal Tort Claims

Act is to be determined in the same manner and to the same extent as a private individual

under like circumstances. 28 U.S.C. §2674.

3.      28 U.S.C. §1346(b) provides that the district courts shall have exclusive

jurisdiction of civil actions on claims against the United States for money damages for

personal injury or death caused by the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his employment under

20

circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

4.     The alleged negligent treatment of Plaintiff Jacqueline Cheese occurred at the Veterans' Administration Medical Center in Ann Arbor, Michigan.  Therefore, pursuant to 28 U.S.C. §1346(b), the law of Michigan is to be applied in this case.

5.     In order to establish a cause of action for medical malpractice, a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care.  *Craig ex rel. Craig v. Oakwood Hosp.* 471 Mich. 67, 86, 684 N.W.2d 296, 308 (2004); *Weymers v. Khera, M.D.,* 454 Mich. 639, 655, 563 N.W.2d 647, 655 (1997).  *See also*, M.C.L. § 600.2912a.

5.     The Michigan legislature has codified the standard of care to be applied in medical malpractice cases.  The relevant statute provides:

> In actions alleging malpractice, the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
>
>> (a)     The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

>    (b)    The defendant, if a specialist, failed to provide the
>    recognized standard of care within that specialty as
>    reasonably applied in light of the facilities available in the
>    community or other facilities reasonably available under the
>    circumstances, and as a proximate result of the defendant
>    failing to provide that standard, the plaintiff suffered an
>    injury.

M.C.L. §600.2912a.

6.    The law only demands that the practitioner use the skill, care, knowledge and attention ordinarily possessed and exercised by others of the profession under like circumstances. *Jones v. Poretta*, 428 Mich. 132, 143-46, 405 N.W.2d 863, 869-70 (1987); *Cleveland v. Rizzo*, 99 Mich. App. 682, 298 N.W.2d 617, 619-620 (1980); *Viland v. Winslow*, 34 Mich. App. 486, 191 N.W.2d 735, 737 (1971).

7.    Absent a departure from the established standard of care, a practitioner is not liable for an unfortunate or bad result.  *See, Jones v. Poretta*, *supra* 428 Mich. at 144, 405 N.W.2d at 869; *Gore v. United States*, 229 F. Supp. 547, 549 (E.D. Mich. 1964).  The mere fact that full recovery does not result or that adverse consequences occur is not in itself evidence of negligence.  *See, Roberts v. Young*, 369 Mich. 133, 119 N.W.2d 627, 629 (1962) (quoting, *Zoterell v. Repp*, 187 Mich. 319, 330, 153 N.W. 692, 695 (1915)).

8.    The plaintiff has the burden of proving both the standard of care and the defendant's breach of that standard.  *Koch v. Gorrilla*, 552 F.2d 1170, 1174 (6th Cir. 1977); *Murphy v. Sobel*, 66 Mich. App. 122, 238 N.W.2d 547, 549 (1975); *Mitz v. Stern*, 27 Mich. App. 459, 183 N.W.2d 608, 611 (1970).  The plaintiff must also establish that the breach of the standard of care was a proximate cause of his injury.  *Weymers v. Khera*,

22

*supra*, 454 Mich. at 647;*Ghezzi v. Holly*, 22 Mich. App. 157, 177 N.W.2d 247, 250

(1970).  *See also* M.C.L. § 600.2912a(2):

> (2)   In an action alleging medical malpractice, the Plaintiff has the
> burden of proving that he or she suffered an injury more probably
> than not was proximately caused by the negligence of the Defendant
> or Defendants. . . .

*Id.*

9.      Michigan law requires a plaintiff to produce expert testimony to show the

applicable standard of care and the fact that it was breached.  The Michigan Supreme

Court has stated:

> In a case involving professional service, the ordinary layman is not
> equipped by common knowledge and experience to judge of the skill and
> competence of the service and determine whether it squares with the
> standard of such professional practice in the community.  For that, the aid
> of expert testimony from those learned in the profession is required.

*Locke v. Pachtman*, 446 Mich. 216, 223, 521 N.W.2d 786, 789 (1994) (quoting *Lince v.*

*Monson*, 363 Mich. 135, 140, 108 N.W.2d 845 (1961) ).  *See also Koch v. Gorrilla,*

*supra*.

10.     It is equally well-settled that expert testimony is required to establish that a

physician's negligence was a proximate cause of the injury for which damages are sought.

*Wallace v. Garden City Osteopathic* Hospital, 111 Mich. App. 212, 217, 314 N.W.2d

557, (1981), *rev'd on other grounds*, 417 Mich. 907, 330 N.W.2d 850 (1983); *Ghezzi v.*

*Holly*, *supra*, 177 N.W.2d at 250.

11.     "Proximate cause" is a legal term of art that incorporates both cause in fact

and legal (or "proximate") cause. *Craig v. Oakwood Hospital*, 471 Mich. 67, 86, 684 N.W.2d 296, 309 (2004). The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. *Id.* 471 Mich. at 87, 684 N.W.2d at 309 (citing *Skinner v. Square D. Co.*, 445 Mich. 153, 162-63, 516 N.W.2d 475 (1994)). On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. *Craig*, 471 Mich. at 87, 684 N.W.2d at 309. As a matter of logic, a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries. *Id.* Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or "but for") that act or omission. *Id.* While a plaintiff need not prove that an act or omission was the sole catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was a cause. *Id.* (citing *Jordan v. Whiting Corp.*, 396 Mich. 145, 151, 240 N.W.2d 468 (1976)).

A.  <u>The Consent Form and Decision to Perform Renal Pelvic Washings</u>

12.  Applying the foregoing authorities to the facts adduced at trial in this case, and having considered and weighed the testimony of the witnesses and the record evidence submitted, the Court concludes that Plaintiff has not proven that the physicians at the VAMC breached the medical standard of care by not obtaining Plaintiff's specific consent to perform renal pelvic washings prior to the commencement of the retrograde

pyelogram procedure on April 15, 1998 or by deciding to do the washings after the retrograde pyelogram showed no abnormalities.  As to these claims, the Court credits the testimony of the attending urologist, Dr. Wolf, and Defendant's expert, Dr. Wood, that a washing is part and parcel of a retrograde pyelogram procedure, and, therefore, no separate consent was required.  Further, as Dr. Wolf and Dr. Wood testified, and as Dr. Hollander, the court-appointed expert, explained in his deposition, the technical aspects of a renal pelvic washing are very similar to the technical aspects of retrograde pyelograpy and it is not a violation of the standard of care for urologists to change their plan in the middle of a procedure and say "let's get a washing now," rather than to have to do another separate invasive procedure later.

13.    Although, as Dr. Wood testified, it is not malpractice to do, instead of washings, a voided urine cytology, as espoused by Plaintiff's expert, Dr. Copeland, the Court credits Dr. Wood's testimony that voided urine cytologies are only 40-60% accurate with respect to detecting cancer, whereas renal pelvic washings are 100% accurate.  As Dr. Wood explained, the additional risk of doing a washing in the course of a retrograde pyelogram procedure when the catheter is already in the ureter is so small that it is hardly worth the risk of missing the cancer to not do them.

14.    All of the doctors who testified at trial testified that it is axiomatic in urology that gross hematuria -- one of the symptoms Plaintiff Cheese presented -- "is cancer until proven otherwise."  This accepted medical axiom coupled with the testimony of Drs. Wolf, Wood and Hollander, persuade the Court that there was no violation of the

25

standard of care when the doctors decided to do renal pelvic washings on Plaintiff on April 15, 1998.

B.    The Stenting Procedure

15.    The Court also concludes that Plaintiff has failed to establish a violation of the standard of care on the part of the VAMC doctors when they did not stent Ms. Cheese earlier than they did, around 4:30 or 5:00 p.m. on April 17, 1998.  The Court again credits Dr. Wood's testimony that the ordinary course of treatment of a patient who has suffered a perforation of the kidney requires only keeping the patient under observation and that with the sequence of events in Ms. Cheese's case, stenting her within a little over 24 hours after discharge and within less than 10 hours after she returned to the hospital complaining of pain on April 17, 1998, was not a violation of the standard of care.

16.    The contradictory opinion of Dr. Copeland, Plaintiff's expert, that Ms. Cheese should have been stented sooner, is predicated upon Dr. Copeland's "gut feeling" that had she been stented 20 hours, after the procedure i.e., the morning of April 16, 1998, instead of 58 hours after the procedure, the afternoon of April 17, 2/3 less urine would have been extravasated, meaning that potentially there might less scarring of Ms. Cheese's kidney.  Dr. Copeland, however, admitted that the presence of urine outside the kidney and the renal pelvis if uninfected is not, by itself, a medical emergency and the natural course of the human body would ordinarily be for urine to be reabsorbed into the surrounding tissues without intervention.  Dr. Copeland further admitted that there is no evidence in this case that Ms. Cheese's urine was infected.  Accordingly, he did not

26

disagree that the standard of practice in such a situation would permit observing the extravasated urine by imaging studies to see if it absorbs over a period of time. This is consistent with Dr. Wood's testimony that in the ordinary course with a perforation of the kidney he would not necessarily stent the patient but would keep her under observation.

17.     Furthermore, in this case, the hospital records show that Plaintiff did not return to the hospital until 11:17 a.m. on April 17, 1998 -- more than 48 hours after the procedure -- although she testified that she had been advised by the VAMC to return at 3:00 a.m., i.e., more than eight hours earlier, when her neighbor called the hospital for her.[17]  A renal ultrasound was done on Plaintiff within less than 3 hours of her return to the hospital, at 1:16 p.m., and it was this ultrasound that gave the first indication that fluid was leaking from her kidney. This was confirmed by a CT scan done at 4:06 p.m., and by 4:30 p.m., Ms. Cheese was being prepped for the stent placement surgery. She was taken into the operating room by 5:15 p.m., i.e., less than six hours after she returned to the hospital. Dr. Copeland admitted that he, too, would do an ultrasound and/or a CT scan before placing a stent in a patient. He further admitted that it takes some period of time for a hospital to get those tests set up and that the imaging procedures themselves take a certain amount of time.

18.     Based upon the foregoing, the Court finds no violation of the standard of care with respect to Plaintiff not having been stented until late in the afternoon on April

---

[17]  As to why it took her so long to get to the hospital, Plaintiff testified only that "it took some time for me to get it together to get there." [9/13/04 a.m. Tr. p. 62.]

27

17, 1998.

C.    Plaintiff's Discharge on April 16, 1998

19.    The Court does, however, find that the standard of medical care was violated when the VAMC discharged the morning of April 16, 1998 when she was undeniably still having a great deal of pain.  Plaintiff's testimony that she was still in a great deal of pain is corroborated by the hospital records, specifically, Plaintiff's Ex. D6, which shows that Plaintiff repeatedly complained of severe pain throughout her post-operative admission to the hospital and was administered high dosages of morphine and Percocet virtually every two hours right up until her discharge in an attempt to alleviate her pain.  In this regard, the Court credits, and concurs with the opinion of Plaintiff's expert, Dr. Copeland.  Dr. Copeland opined that Plaintiff was discharged prematurely and the standard of care was violated because Plaintiff was still, at the time of her discharge, in great deal of pain and the doctors discharged her without having done any diagnostic tests prior to her discharge to attempt to determine the cause of the pain.

20.    Neither Plaintiff's expert nor Dr. Wolf, the attending urologist, refuted Dr. Copeland's opinion.  Dr. Wolf, in fact, admitted that he wished they had not discharged Ms. Cheese to go home because, as a result,"she went through suffering that she didn't need to."  Dr. Wood also admitted that, given the level of pain Ms. Cheese was experiencing as evidenced by the quantity of narcotics she was given, somebody more senior should have been called in and consulted before she was discharged.

21.    The Court further finds that this violation of the standard of care was a

28

proximate cause of Plaintiff's pain and suffering, loss of enjoyment of life and mental anguish from April 16 - April 17, 1998. As indicated, Dr. Wolf admitted that as a result of having been discharged the morning of April 16, 1998 when she still in a great deal of pain and without having determined the cause of the pain caused Ms. Cheese to "[go] through suffering that she didn't need to."

22.    However, the evidence presented is insufficient to support a finding that Plaintiff's discharge the morning of April 16, 1998 was a proximate cause of the loss of her kidney. Plaintiff's theory is that scarring resulting from the leakage of urine was what caused the calcification of her kidney which, in turn, required that it be removed. However, had Plaintiff been kept in the hospital, it is not at all certain that she would have been stented to stop the urine leakage any sooner. As indicated above, Plaintiff's own expert, Dr. Copeland, admitted that the presence of urine outside the kidney and the renal pelvis if uninfected -- as was the case with Ms. Cheese -- does not normally require surgical intervention and the natural course of the human body would ordinarily be for urine to be reabsorbed into the surrounding tissues without intervention. Dr. Copeland further did not disagree that the standard of practice in such a situation would permit observing the extravasated urine by imaging studies to see if it absorbs over a period of time. This, as indicated, is consistent with Dr. Wood's testimony that in the ordinary course with a perforation of the kidney he would not necessarily stent the patient but would keep her under observation.

23.    Furthermore, although Plaintiff's expert, Dr. Copeland, opined that his "gut

feeling" was that had Ms. Cheese been stented the morning after the procedure, i.e., on April 16, 1998, instead of having been discharged to go home that morning, there might have been less scarring of the kidney, he admitted that he could not say that earlier stenting Plaintiff would have entirely eliminated the danger of scarring such that Plaintiff would not ultimately have needed a nephrectomy.

24.    Indeed, Dr. Eduardo Kleer, the urologist who treated Plaintiff after she treated with the VAMC and who ultimately removed Plaintiff's kidney, testified in his deposition that scar tissue had built up "from everything that she had gone through,"i.e., not only as a result of the perforation of her kidney at the VAMC but also from the two stent surgeries -- one performed by the VAMC and the other performed by Dr. Kleer -- and from the surgical procedure later performed by Dr. Kleer to insert a drainage tube into Plaintiff's kidney to allow her kidney to drain to a bag outside of her body.  [*See* Kleer Dep., pp. 20-26.]

24.    In sum, the evidence presented is far too speculative to draw a nexus between Plaintiff's discharge on April 16, 1998 and the ultimate loss of her kidney two months later.

25.    However, as indicated, the Court does find that the evidence presented was sufficient to show that Plaintiff's discharge the morning of April 16 was a proximate cause of Plaintiff's pain and suffering, loss of enjoyment of life, and mental anguish from April 16 - April 17, 1998, and for that she should be compensated.  The Court finds that

30

$15,000 is a reasonable sum to compensate Plaintiff for one day of pain and suffering given all of the circumstances presented in this case.

### IV.  CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that JUDGMENT be entered in favor of Plaintiff Jacqueline Cheese and against Defendant United States of America and that DAMAGES BE AWARDED to Ms. Cheese in the amount of $15,000, plus interest, costs and reasonable attorneys fees.  With regard to the award of attorneys' fees and costs,

IT IS FURTHER ORDERED that, within 14 days of the date of this Opinion and Order, Plaintiffs' attorneys shall file with the Court and serve upon Defendant a verified and itemized affidavit of costs and fees incurred in connection with this matter.


s/Gerald E. Rosen_____
Gerald E. Rosen
United States District Judge

Dated:  September 27, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 27, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry_____
Case Manager

31